## NOCONA COTTON SEED OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97526. Promulgated November 8, 1940.

*Harry C. Weeks, Esq.*, and *R. B. Cannon, Esq.*, for the petitioner.
*Frank B. Schlosser, Esq.*, for the respondent.

# 1176

DISNEY: The respondent determined the deficiencies above stated by adding to the $11,366.33 net income reported the item of $715.36, because of the depreciation sustained during the taxable year ended May 31, 1937, but not taken into consideration in determining the gain from the sale shown by the return, thus arriving at a capital gain of $18,073.86, instead of $17,358.50; and by determining an adjusted undistributed net income of $9,522.38 subject to surtax. Petitioner avers that there was error in the determination of deficiency in that there was no capital gain, but a loss, contending that the petitioner sold for $6,000, and that the depreciation taken in earlier years and used in the return and by the Commissioner in calculating profit or loss was excessive. It further alleges a right to a credit due to payment of the sales price to the bank under a written contract executed prior to May 1, 1936. Upon brief it contends also that the conveyance of the assets was one in liquidation, resulting in no gain, and finally that, since McCall held 40 percent of petitioner's stock, it is entitled to a dividends paid credit for 40 percent of the amount of funds going into McCall's hands.

1. The first question for our determination is the amount which petitioner received for the property sold. If petitioner received only $6,000 as it contends, there would be loss instead of gain in the transaction, on the theory of either party, and hence no further question for solution. Whether petitioner received $6,000, or $26,000 (net $25,000 after payment of $1,000 commission) depends upon the status of C. McCall and his relation to petitioner in the transaction. The petitioner contends that McCall was not trustee for it, or its stockholders, that the sale was an arm's length sale at public auction for $6,000, resulting in a loss to it, and that McCall in disposing of the $26,000 received by him acted only for the bank. We think the record contradicts such conclusion. Though there is some evidence that the stockholders' resolution designating McCall as trustee for them was not participated in by him, that he made no agreement with them, and that the original agreement terminated because the proposed purchaser refused to take title from the petitioner, thus ending any trusteeship by McCall, the matter proceeding as an arm's length sale under the trustee's deed; nevertheless McCall's further testimony and other facts of record convince us that he was trustee for petitioner and its stockholders. He testified that the trustee's sale was merely to perfect the title so that the Norris people would take it and that he represented both the bank and petitioner's stockholders. The resolution of August 31, 1937, shows Norris to be the proposed purchaser in the transaction as to which McCall was designated trustee; and Norris did in fact purchase. The second return for the taxable year here involved, which McCall transmitted by letter, recites that $4,445.02 cash was being

"held by C. McCall, *Trustee, for Stockholders per resolution August 31, 1937.*" (Italics supplied.) Though the return was not signed by him, his letter of transmission recites that "We" are enclosing the return, and refers to C. C. Littleton, petitioner's president, who signed the return, and a copy of the resolution of August 31, 1937, is attached. We think McCall was familiar with the return and that it represents his view as well as that of the officers of petitioner. Moreover, the fact is that McCall still holds money for petitioner's stockholders, and his letter recites that, after paying the Federal tax, he wishes to pay them their remaining funds. He paid, out of the $25,000 from the sale, not only for cottonseed purchased by petitioner, which was not covered by the deed of trust, but other bills for petitioner. Had McCall purchased the property for $6,000 at an arm's length sale, he would have had no duty of paying petitioner's debts. In such case the trustee under the deed would have had the duty of applying the $6,000 in part satisfaction of the debt of $8,900 and interest, and the balance would have remained unpaid by the petitioner, unless it had other property, which appears not to be the case. We think it plain that McCall acted as trustee for petitioner and stockholders and that the petitioner received $25,000 net for its property. We so hold.

2. Was any profit realized upon $26,000 received, after paying $1,000 commission? The petitioner's amended return, on the accrual basis, introduced by respondent showed an original basis of $50,850.66 (without land valued at $1,000) and a reserve for depreciation of $43,445.45 with only $7,405.21 remaining cost or other basis to be recovered. This would, of course, upon the above determined sales price of $26,000 show a large capital gain, and petitioner's return itself, therefore, lists a capital gain of $17,358.50 (which respondent increased by $715.36 because of petitioner's failure to consider that amount of depreciation). To this the petitioner's answer and contention is, in effect, that in its return it committed error, in that in fact the depreciation set up was excessive, leaving to it a greater base, and that, for the years 1933 to 1937, the petitioner had net losses instead of income against which to charge the depreciation taken under principles announced in *Pittsburgh Brewing Co.* v. *Commissioner*, 107 Fed. (2d) 155. Assuming, without here considering, the correctness of the principle announced in that case, we do not find in the record as to the years 1933 to 1937, sufficient evidence to cause its application, for all that the record before us shows is that the petitioner filed returns for 1933 to 1937 showing net losses, and depreciation deductions charged off, as above shown in the findings of fact. This of course does not prove the facts shown in such returns. It is in evidence, moreover, that expense amounts not shown, other than the depreciation deductions, entered into the computation of net losses, and we have no evidence as to whether such expenses were, or were not, in fact, incurred or allowed or disallowed by the Com-

missioner. In other words, we do not know that in fact the depreciation items did not offset taxable income, which showing is required by the *Pittsburgh Brewing Co.* case, if they are to be held not "allowed." The petitioner argues that whether the Commissioner disallowed items so as to affect the net losses relied upon to show that the depreciation items were not "allowed" was for the respondent to show, he having known in advance of petitioner's contention and having had the returns in question at trial. He cites cases as to failure to produce evidence readily available. But such principle did not require the respondent to prove what was petitioner's burden. Petitioner also relies upon the fact of the determination by the Commissioner of depreciation of $715.36 for the year 1937, as proving that for the years 1933 to 1937 the reasonable allowance was not more than that amount per year. It does not follow from this that the actual depreciation was the same in earlier years. *Washburn Wire Co.* v. *Commissioner*, 67 Fed. (2d) 658. The same case, citing *Kansas Milling Co.*, 3 B. T. A. 709, holds that "A contemporaneous estimate of depreciation, made by a manufacturer with respect to his own machinery, and entered on his books, is some evidence of its correctness." Here we have petitioner reporting, in 1937, a depreciation reserve of $43,445.45 and remaining cost to be recovered of only $6,438.23. Obviously this, assumedly the bona fide judgment of petitioner, should not without convincing reason be found not to prevail, particularly as to the earlier years, against the respondent's figure of $715.36 for 1937. As to the years prior to 1933, the evidence is even less effective. We have, in effect, only the fact that in 1937 there was an accumulated operating loss of $56,911.31, without information as to what in particular, or what years, contributed thereto. Nor can the evidence that the plant was used only three or four months per year, and repairs and replacements made, be considered to prevail. These items were charged to expense, and are not shown to be other than ordinary repairs. No more can be said for the fact that the plant was sold for $26,000. The fact that the plant was kept in repair and the corporation was a going concern may well have influenced the purchaser. We consider this evidence insufficient to meet petitioner's burden to show excessive depreciation taken in former years, and hold that it has not proven such excessive deduction of depreciation as to require readjustment of the basis determined upon sale in the taxable year as reported by petitioner and determined by the respondent.

3. The next problem presented is, whether the conveyance to C. McCall on October 5, 1937, was a sale giving rise to recognizable gain or loss. Petitioner in the alternative says that it was not, but was a distribution of assets in liquidation. Though stated, this contention is not argued. We have held that C. McCall was trustee for petitioner's stockholders. Conveyance to him was not by way of distri·

bution in liquidation. He has not yet distributed to the stockholders the proceeds of the sale.

4. Next we consider whether petitioner is entitled to a credit under section 26 (c) (2) of the Revenue Act of 1936,[1] on the theory that the sale of the petitioner's assets provided a credit under the words of that statute "An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt." Though agreeing upon brief that the contract evidenced by the trust deed did not require, so long as petitioner retained the ownership of the property, that it set aside or pay out of its current earnings any specific sum, with the possible exception of interest, petitioner argues that as soon as the property was sold, the entire proceeds of sale was required by the trust deed to be paid over (to the amount necessary) to the bank and applied on the indebtedness; and that thus the facts here involved comply with the statutory requirement that earnings and profits be paid in discharge of a debt. Petitioner says that its only gross income, if any, was from the sale of the assets, that "practically the entire amount of these proceeds were required to be and were paid over to the bank", and that therefore credit is due. Even assuming the correctness of the theory, the record shows, however, that out of the $26,000 only about $9,000 was paid to the bank under the deed of trust, or its written provisions. The payment of about $13,000 (for cottonseed purchased) is not shown to have been under a written contract, or one executed prior to May 1, 1936. On the contrary, McCall testified:

Q I will ask you what agreement, if any, existed between the bank and the mill with respect to the deed advances as to whether they were to be secured by this deed of trust?

A Well, probably I was securing the bank more than anything else. I don't know that the deed of trust would have secured those seed, but it was willing to, and understood it could be paid.

This tends to show payment under some sort of oral and apparently contemporaneous agreement. An oral agreement is not sufficient.

---

[1] (c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

*     *     *     *     *     *     *

(2) DISPOSITION OF PROFITS OF TAXABLE YEAR.—An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. For the purposes of this paragraph, a requirement to pay or set aside an amount equal to a percentage of earnings and profits shall be considered a requirement to pay or set aside such percentage of earnings and profits. As used in this paragraph, the word "debt" does not include a debt incurred after April 30, 1936.

Certainly one in writing is not shown. *Northwest Steel Rolling Mills, Inc.* v. *Commissioner*, 110 Fed. (2d) 286. To the extent of payment for cottonseed, plainly petitioner can not rely on section 26 (c) (2).

Considering then the amount covered by the trust deed: Upon brief the respondent refers to the amount paid the bank as in satisfaction of an ordinary debt "of long standing" and seems therefore to make no contention that the contract involved was not executed prior to May 1, 1936. We so assume. Was there, under such contract, paid to the bank an amount entitling petitioner to credit under the statute above quoted? We think not. There was no measurement of the payment to be made by the earnings and profits of the petitioner. The contractual provisions do not, within the language of *G. B. R. Oil Corporation*, 40 B. T. A. 738, cited by petitioner "inevitably require in their performance a drawing on current earnings, thus removing current earnings as a source of dividend payments." In that case the bank was by the contract assigned the properties with right to collect the entire income therefrom and apply the entire amount on the debt. Here there is only the usual provision for sale upon default of property mortgaged. The contract did not, as petitioner argues, require that all or "practically all" proceeds of the sale be paid to the bank, and thereby include "all earnings and profits." In fact, only about $9,000 out of $26,000 proceeds of sale was so paid. The balance was payable to the petitioner, so far as the written contract was concerned, and even after about $13,000 had been paid to the bank under a separate and apparently oral understanding for seed purchased, the remainder was held for the petitioner, or its stockholders. No amount "equal to a percentage of earnings and profits" was required by the trust deed to be paid or set aside. We conclude and hold that such a contract is not within the purview of section 26 (c) (2) of the Revenue Act of 1936.

5. The petitioner lastly argues in the alternative that, since C. McCall owned 40 percent of the stock of petitioner, therefore to the extent of 40 percent of the assets or property received by him, and subject to his command, a credit should be allowed in computing surtax on undistributed adjusted net income. We think such contention is untenable. Apparently the theory is based on section 27 of the Revenue Act of 1936. Subsection (g) thereof provides that a dividends paid credit can not be allowed unless the distribution is pro rata, equal in amount and with no preference to any share of stock as compared with other shares of the same class. McCall alone could not be the subject of a dividends paid credit. Moreover, no dividend has been paid or distributed to the stockholders. We hold that petitioner is not entitled to dividends paid credit. Finding no error in the determination of the deficiencies involved,

*Decision will be entered for the respondent.*